We will hear argument next in Case 21-1450, Turkiye Halk Bankasi A.S. v. United States. Ms. Black. Mr. Chief Justice, and may it please the Court, Schooner Exchange held that general laws describing admiralty jurisdiction do not reach foreign sovereigns. The reasons for that clear statement rule, notice, and equality among independent nations, apply with greater force here. It is outlandish to think that Section 3231 authorizes federal courts to convict Spain. The U.S. does not dispute that criminal trials against sovereigns were unthinkable in 1789, would violate international law today, are unprecedented anywhere, and would risk retaliation. But all the same is true for sovereign instrumentalities, which, by definition, are sovereign. Schooner Exchange, after all, is an instrumentality case, a ship. And the FSIA defines foreign states to include instrumentalities. U.S. instrumentalities, like the Export-Import Bank, are sovereign. The FSIA independently bars criminal jurisdiction. Section 1604 provides that foreign states shall be immune from the jurisdiction of federal and state courts. Reading the word civil into that text would mean Congress created special guardrails in civil cases, but threw sovereigns to the wolves in criminal cases. The executive applauds this result, arguing that it alone makes the common law of criminal immunity. But the executive does not make the law. And an immunity waivable by your prosecutor is no immunity at all. Plus, the government's commercial instrumentality rule contradicts every common law benchmark. History, international practice, reciprocity, and the choice already made by Congress to define foreign states to include instrumentalities. Finally, Section 1605's commercial activities exception cannot apply in criminal cases. Section 1330 grants jurisdiction for the exceptions in civil cases only. And a contrary reading produces two radically implausible and dangerous results. Foreign states themselves would be stripped of criminal immunity in commercial cases. And because Section 1605 waives immunity in state courts, states could prosecute sovereigns, and the executive would be powerless to stop it. I welcome questions. Ms. Blatt, just so I can understand analytically your argument, could you waive immunity in district court? And after the waiver, would they have jurisdiction? No. Under subject matter jurisdiction, it's not waivable. Is there another instance in which we have seemingly conflated subject matter jurisdiction and immunity? I mean, I don't think so. Schooner Exchange is a jurisdictional holding. This court has said in many cases, although the holding goes to jurisdiction, it later got developed in the civil context as absolute immunity until the restrictive immunity developed. But, I mean, the Foreign Sovereign Immunities Act also on its face says jurisdiction, they shall be immune from jurisdiction in federal and state courts. So, I mean, we have two independent arguments. The first is just a broad argument saying there's no jurisdiction under 18 U.S.C. 3231 for foreign sovereigns. And if this court rejects that, we have another argument saying, well, the FSIA on its face in Section 1604 would cancel out any criminal jurisdiction that might otherwise exist under Title 18. I don't see how the difficulty I'm having is understanding how the immunity claim is woven into subject matter jurisdiction. Sure. Our immunity claim is if there is subject matter jurisdiction and the Foreign Sovereign Immunities Act doesn't apply, we would say there's still a common law immunity because there just never has been a criminal prosecution of a sovereign or its instrumentality anywhere. And the only argument the executive has is that it has the unilateral right to decide if there is criminal immunity. But just like, you know, just foreign sovereign immunity is a well-developed common law ground that courts develop, which is one of the reasons we say that the court has to decide that question. But normally in an immunity case, you could waive immunity. And so it's rather personal. It could be an affirmative defense. But I don't normally think of it as a part of subject matter jurisdiction. That's correct. The immunity argument is a tertiary argument. If you've already rejected the argument that there's no jurisdiction, then it's absolutely waivable by sovereign or state or anyone else, the federal government. And yes, so absolutely, immunity is waivable. It's just that if you agreed with us on either the FSIA or – well, the FSIA has its own waiver provision, so the sovereign can always waive under the FSIA. But aren't you hamstrung there because that's civil? Well, no, our main argument is that the Section 1604, which bars any jurisdiction, speaks more broadly than Section 1330, which opens up only civil jurisdiction. So the actual immunity conferring provision or jurisdictional stripping provision is textually broader. It's not limited to civil cases. But then you trap yourself with the exception for commercial activity. Right. So I don't think that's correct. But for the three reasons, text, structure, and purpose, the text is that the only grant of jurisdiction for the exceptions is in 1330. And so remember, the 1330 is part of the FSIA. It's passed in one continuous act. The very first provision of the Foreign Sovereign Immunities Act is Section 1330. And it says there's civil jurisdiction for these exceptions. And then you get to the broad cancellation of all jurisdiction and then the 1605 waiver. The second reason as to structure, why I don't think the commercial activities exception could possibly apply in criminal cases, is you would think Congress would actually care about how those cases would proceed. And all of the provisions that go to venue, service, answering the complaint, removal, are all on their face civil only. And so it leaves, you know, it's just inexplicable. And finally, the results that I said are borderline, you know, cataclysmic, that 50 states, all counties, and any city in this country that has prosecution authority would all of a sudden have jurisdiction to prosecute any country qua country. And because Congress has expressly waived immunity and canceled it out on the statute, the executive branch can't do anything about it. And so the executive can cry and say this could start a war, and you're stuffed with a statement by Congress saying, yeah, but Congress waived immunity for all commercial activity exceptions. Ms. Brown, assume I accept all of this, but I'm going to follow up on Justice Thomas's question. I have problems seeing immunity as subject matter jurisdiction. And assume I have that problem and say there's jurisdiction, that still doesn't answer the immunity question. And if I go a step further, and for all the reasons that you gave, and say the Foreign Sovereign Immunities Act is only about civil and the waiver that's there is only about civil litigation. Every aspect of civil litigation has to go through the FSIA. So now I come down to your common law immunity question. If that's what remains for me, I've got two paragraphs in the Second Circuit decision. Both of them, and most of the paragraph assumes that it runs on, the common law immunity runs on the FSIA. But if I say the FSIA doesn't deal with criminal, that undercuts all the reasoning of the Second Circuit. What do I do then? You want me to decide the question. Yeah, but let me just start you back with Schooner Exchange. I mean, that is a Supreme Court case by Chief Justice Marshall that's on its face says you don't construe general jurisdictional statutes. It is an admiralty jurisdictional statute. It's in the very same Judiciary Act. You're fighting my premises. So please don't fight my premises. Assuming that I disagree with you on the two aspects of the question presented, that it's not jurisdiction, that it's a common law immunity question. Yeah, so if you thought that Congress authorized district courts to convict foreign states at the time of the founding, if you think that, and you think that a broad grant that's not limited to civil cases does not protect foreign sovereigns, and that Congress just didn't care about whether foreign sovereigns could be convicted, then all we have is immunity. It's not a question of not caring. It's a question of defining what the common law immunity is. The government gives us a lot of options. It says, yes, there's absolute immunity, and it appears to say it's absolute immunity from criminal prosecution if you're naming the state. I don't know how you name a state unless you just say the country of X, because it seems to exempt out all agencies and instrumentalities, and I don't know any government that doesn't act through agencies and instrumentalities. So it seems to go a step further in saying, well, there's absolute immunity if those agencies and instrumentalities are doing sovereign acts. That begs the question here, because the little bit that I've seen about this case is that the government not only owns this bank, but that the government directs the activities of this bank, and that the bank is involved in sovereign activities because it collects taxes for the sovereign. It appears, or some of the allegation is, that it also engages in social services activities, and the allegations in the complaint say the sovereign, the government dictated what the bank was doing with respect to these transactions. The other side will have to answer that for me. It seems sovereign enough to me. Yeah, you're absolutely correct. Okay, it seems sovereign enough to me, but I don't know whether I should get there. Isn't this an issue that we should send back, given that the Second Circuit proceeded in its analysis from a series of assumptions that we would be disagreeing with? So to get there, you would have to say there's subject matter jurisdiction over sovereigns, instrumentalities, and agencies, so we're wrong on 13.2.1. The FSIA doesn't apply, and then, yes, you would say common law immunity is not uniformly in the hands of the prosecutor. Well, they can see part of that. Let me just hit on what you said. The indictment ten places says the government of Turkey committed a crime, and it did it through its bank. It ten times accuses the head of a foreign state of committing a gazillion criminal acts and says, and you ran it through your bank, that you owned, operated, and that is an affiliate of the Ministry of Finance, and that the minister is as if Janet Yellen and the Department of Treasury committed a crime. So, counsel, if I understand it, after fighting the hypothetical, you would agree that a remand for consideration of the common law immunity would be appropriate. If you reject. Yes, yes, yes. Yes, yes, yes, obviously. If you reject all of our arguments, yeah, remand is definitely. I don't think that was the question. No, it wasn't, but it's okay. I think we've got exhausted it. If we disagree with you on the FSIA point, just that, and then I think the question, maybe I'm misinterpreting it, but it's my question too. Is it appropriate then to just remand and let the Second Circuit take it from there? So, if the FSIA doesn't apply. Or is it inappropriate? We have an independent certiorari question that says there's no jurisdiction under Title 18. So you're saying the court just doesn't pass on that? Correct. I mean, you can do whatever you want, obviously. The reason you shouldn't do that, because if there's just this common law immunity, for the first time in the history of the world and on the planet, time immemorial, you are saying that it's conceivable a foreign state can be indicted if it lacks immunity. Well, just to press you on that, if we're going to take it at that level of generality, I think it's pretty bizarre for this court to tell the President of the United States, as a matter of his national security exercise, that even though the Constitution doesn't prohibit what you're doing, even though a statute doesn't prohibit what you're doing, this court's going to prohibit your exercise of national security authority. Talk about big steps. It is. That's huge. It's huge. There's unreviewable authority of the executive branch's prosecution decision when it's acting pursuant to a congressional authority. And so you first have to think that Congress gave jurisdiction for a federal court to convict a sovereign. It has nothing to do with the executive branch. The language is clear, 3231. I mean, it's not qualified. So it seems like if we disagree with your reading of Schooner Exchange, as a subject matter jurisdiction case, I mean, as we just said in the last case, the word jurisdiction is of many, many meanings. I mean, in many ways, it's kind of like a personal jurisdiction claim, and this goes back to what Justice Thomas was saying. I mean, it seems to me like maybe one reason we don't see these prosecutions is because the executive understands foreign countries to have absolute immunity and so would rarely assert them. Because I agree with Justice Thomas, we typically think of immunity as something that can be waived, and then 3231 is just simply saying that if there is a situation in which there is no immunity, in which the conditions are otherwise right, that the district court is available. But there are all kinds of reasons, maybe as a matter of substantive law, as a matter of immunity defense, why that prosecution never gets brought. What's wrong with that? Well, let me just take you back to the founding. Section 9 is a jurisdictional provision that has the Alien Tort Statute and it has the 1331 predecessor plus the admiralty jurisdiction. In Section 13 of the same Judiciary Act, this court got original jurisdiction over diplomats and their servants. The first Congress made it a crime to prosecute a domestic servant or a diplomat, and it seems inconceivable that the first Congress thought that a district court had jurisdiction to convict a foreign country. And if I can just argue about instrumentalities, because I hear you about President Biden or President anyone on instrumentalities abroad, but we have over 90 corporations, we have Voice of America, Export-Import Bank, and one person's freedom fighter is another person's terrorist. Our U.S. instrumentalities do stuff abroad and could be seen to aid and abet terrorism. Well, that's why we have a president who's elected to protect the national security of the United States and consider those issues, and this was President Trump and now President Biden agree, and this is at the highest levels of negotiations between the United States and Turkey. This case is apparently part of those discussions and part of the effort to prevent Iran from sponsoring terrorism, getting involved in the Russia-Ukraine. That's why we have a president to consider that, plus the implications if you do something like that. And we also have a Congress which can put restrictions on it, but again, assume your FSIA argument doesn't work. I don't know. What expertise do we have to balance all those considerations? Your expertise is to make sure that you think Congress actually authorized a federal court since the time of the founding, because the language hasn't changed, that Congress actually contemplated that there could be a criminal prosecution and conviction when it seems to me unthinkable after this country and all the federalist papers and the constitutional debates and a so fundamental principle of international law. But is that a matter of jurisdiction or is it a matter of immunity? The thing that concerned me about your brief and perhaps even the way you're reading the Schooner exchange case is that these are different concepts, and so it's possible that you're absolutely right that no one contemplated criminal liability of a foreign state, but as a matter of absolute immunity, not as Justice Barrett was pointing out, if everything else was cleared away. There's no immunity in a particular case or whatever, whatever. And then the question is, does the court have jurisdiction? And the language of 3231, it seems to me, speaks to all offenses against the laws of the United States. It doesn't carve out or focus on any particular defendant. And so I just don't understand why you're making a jurisdictional argument. Shouldn't we just be focused on immunity in this case? So one more time on jurisdiction, then I'm going to give up and go straight to immunity and talk about the FSIA. But on jurisdiction, the argument in both the face of the opinion and every century, there's Berizi brothers, Samantar, and Kiowa tribes. You've got a case per century saying Schooner exchange was a jurisdictional case. The actual government argument of government counsel was do not misconstrue this statute because it would be a judicial declaration of war unless Congress gave you that authority. And I read the opinion, but there's nine of you and one of me, and you have all the power. So you're going to read the opinion how you want. But I read it on its face to say jurisdiction. But now let's say, OK, so we're done with that argument. Let me just talk about immunity. To say that you just bypassed the FSIA is huge. Congress issued past a landmark statute in 1976. In a very particular context. The context, as I understand it, was that Congress was concerned that Americans who were suing foreign entities didn't have real assured certainty about whether or not their actions were going to be considered because a lot of the power to identify circumstances of immunity or not was with the executive branch. And so they wanted to codify rules in the civil context for when a foreign country was going to be immune. I don't see anything in the statute that suggests that Congress was focused on or was thinking about immunity for criminal prosecution. Well, except for the language of a provision that does not limit it to civil, and it's the most fundamental provision in the statute, 1604, which grants immunity from jurisdiction. But it also seems to us, which is said in our opening, that Congress just left this subject to juries and that, you know, amenability to fraud claims, all the special protections. The statute goes on for pages and pages. I have no doubt that Congress was thinking about civil prosecutions because those are the only kind that ever existed. And I do think it is a big step to say that this court is going to say and leave it to courts when Congress has not spoken and the only time Congress spoke, it granted broad immunity and then laid down these very specific procedures on how you would ever go about entertaining jurisdiction over a foreign sovereign or its instrumentality. Ms. Blatt, if we accept your arguments when it's applied to sovereigns as such, is there any way to distinguish those arguments when it comes to a 51% commercial enterprise that may or may not even be identified as associated with the sovereign, but the sovereign owns one more share to form a majority? Yes. Our definition of an instrumentality is it has to be created and designated as such by the sovereign and ownership and control. So you wouldn't have 51% doesn't get you there. Why not? I mean it's 51% control and ownership and all that. Because I think for just anything kind of even arm of the state or federal instrumentality, it's important to have the designation by the government and created. So you're saying they would choose? There are some where they're going to say this is us and others where they're going to say we just happen to own the majority of the shares? That's what Congress does. And this court has always deferred to Congress's judgment when it designates a federal instrumentality by statute. What I'm trying to prevent is a situation where if a foreign country just bought a U.S. company and had control. I don't think that means it's a foreign instrumentality. If it's an organically created by the foreign country, and here it's actually an affiliate of the Treasury Department or the Ministry of Treasury, so it's much more than that. So I don't think it can just be this 51%. But cases like, you know, LeBron, Amtrak, Thacker, FDIC versus Meijer, you've had a million cases involving federal instrumentalities, and it's always been enough that Congress designated it as such, and it is a sovereign but for the sue and be sued clause, which weighs the immunity it would otherwise have. And, again, what worries me and why I think Congress should have a vote is I don't think not every president in every foreign country may feel the way our president does, and all we're saying is that Congress should speak clearly before opening up federal courts to that jurisdiction. Once Congress has it say so, then there's nothing you can do about any prosecution. The government gets to decide who to prosecute. But usually there's congressional authority, and then you have a bunch of cases saying sovereigns, including foreign sovereigns, aren't persons. It's just a presumption that general statutes don't include the sovereign. But it seems, though, kind of going back to this immunity point, in other countries I assume that this is a matter of international law, that the sovereign immunity say that the United States may enjoy, that it's not controlled by jurisdiction there. So why would it all fall apart if it's controlled by immunity doctrine and not jurisdiction here? They have many, or not many, Maxie. They have comparable FSIAs in some places like South Africa and Israel. But, yes, it's just been, I mean, the world has been around for like 7,000 years, and no country has ever tried another country. Well, it just never happened. And so to sort of say, well, some Second Circuit case can figure it out. District courts will muddle along as long as the president says it's okay. Our country's different. We're special. Hopefully no other country will retaliate. Just one more. Let's say that I disagree with you on the 3231 point, and so we are talking about the FSIA. And I'm looking at 1604, which broadly, if you're just looking at 1604, you know, they have these arguments about context of civil cases. But just looking at 1604, you know, that language seems to grant immunity here. But then, you know, the government says that when you get to 1605 that all of a sudden you're doing this switch. Oh, no, no, now the exceptions only apply in civil cases. I think, you know, that's a pretty good argument. What do you have to say to that? Just 1330. Again, the FSIA, I know it's a couple pages down in a blue brief, but if the act of the FSIA starts with Section 1330, it says there is jurisdiction for cases falling within the exceptions in 1605 through 1607. So the first provision of the FSIA. But if we disagree with you about the criminal grant of jurisdiction, does that argument work as well? Not as well. What do you have left in those circumstances? Let's say we accept your 1604 argument, put aside the jurisdictional statutes for the moment. Just looking at 1605, why wouldn't it apply in criminal cases too? So very much we were leaning on Section 1330 as per text. That's our only textual hook. But the structure and the consequences are pretty extreme because on its face it says it applies in state courts, and it just would allow any state to prosecute a sovereign. So state courts would have jurisdiction and could foreign sovereigns, I'm sorry for going over, even remove to federal court in those circumstances? No. And if you take the holding below that even though everything happened in Turkey, commercial activities applies, it just blows open the FSIA in every county, city, state court. Justice Thomas? Justice Scalia? Justice O'Mara? What do I do with the fact that many other countries have FSIA provisions that explicitly say they don't cover criminal cases? Those countries go exclusively on common law. So you are making the argument that many people copy our act, but they don't copy it completely. They exclude criminal cases. Yes. So correct. Two points. One, we think that's what they did in 1604, but you're absolutely correct that the ones we cite in footnote two are specific to criminal. And two, the only thing we know about international law is that French highest court case that says you can't criminally prosecute the Malta Maritime Authority for acts that relate to the sovereignty of the state. We have permitted a suit against a vessel that was owned by Mexico, I think it was, but operated by somebody else, correct? Yes, the Hoffman case. And you do have a lot of cases that we think they're talking about, is there enough sovereign attributes over the ship. But again, we do rely a lot on history that there's always been absolute immunity, no ands, ifs, or buts for criminal cases. Justice Kagan? Ms. Lodge, you said in response to Justice Barrett's 1604, 1605 argument that you were leaning quite heavily on 1330. But I'm wondering whether 1330 makes your position even stranger. I mean, you're depositing a statute that starts at 1330 with the jurisdictional provision, clearly only looking to civil cases, then switches to civil and criminal on the main immunity provision, and then switches back when you get to exceptions to immunity to only civil cases. And I would think that you look at those three sections and you think they should all work together, they're all governing the same universe of claims, and that suggests that 1604 is doing only civil, just as 1330 clearly is, and as you say, 1605 is. Yeah, and so just two points. And I think the backdrop of all of this is that the FSIA was trying to codify international practice and law. And international law, I don't think the government can dispute this, is there's been absolute criminal immunity. So Congress had no reason to do anything at all about procedures or anything else when it came to criminal cases, because there's no such thing. So Congress passed a very broad immunity statute, and then everything else it has to say about the subject is civil, because those are the only kind of cases that can go forward. So yeah, I see how, you know, the you you did. But if you just look at it from what Congress had in front of it, there was no such thing. The government has two subpoena cases, and that's it. There's never been a criminal prosecution of a sovereign or its instrumentality here or anywhere. And so just Congress. Otherwise, one would think that if Congress knew that it was even possible, they might have allowed removal. They might have done things like been respectful on service and said, maybe you should send it to the embassy instead of FedEx. They just presumably would have said something. Well, maybe Congress thought, would they have said something if they thought that there was common law immunity so that the statute didn't have to get involved? Then they wouldn't have passed a statute with any involvement of criminal actions. Oh, no, Justice Kagan. We know you've said this so many times that the FSIA was to clear all this immunity up once and for all because it was a disaster. Well, but what was a disaster was a lot of civil actions. As you say, the criminal actions were never brought. And they would have done something about juries. I mean, I just think, again, that the one thing just to not have any protections or any procedure seems to me quite odd when Congress thought so comprehensively about even the notion of sovereign immunity. And so to us, it seems odd that Congress, I think it's attributing that Congress is just not like the word indifferent, but would let the Justice Department or the president rather the president control how these things happen. There would be juries. There would be fraud claims. There would be no removal if state courts, states can, I mean, I think the government's view is that states could prosecute, and you have to figure out how it's preempted under I don't know what law. I'm sure you'll ask them about preemption, but I don't even know how they would muddle through how this would work out in state court under common law immunity. Okay, thank you. Justice Gorsuch? I do have a few questions, sorry. On the common law immunity point, it's just zero in on that. I think the other side makes two main arguments. One, there is a long tradition of deferring to the executive with respect to assertions of statements of support for immunity or not. So that's one argument. The other argument is that there's a long tradition, they say, where state-owned corporations engaged in commercial activity don't have that common law immunity. So if you could take those two first. I have more after that, but anyway. Sure. So on the first two, I mean, the Tate letter, the high watermark for let's just do whatever the executive says, it's the Hoffman case where there's that footnote that says state department's views are important but will decide itself. But that high watermark is before the Tate letter that says the executive branch can't control the judiciary. And I do think there's some separation of powers problems plus a due process problem when you have an adjudicator that defers, bindingly defers to one side of it's a criminal case, it's self-dealing, and there's a due process violation. So that's just problematic. Even in the civil, it's more problematic in criminal where someone's not liberty because you can't put a foreign government in jail, but there's massive political ramifications of being convicted. On your second question about how the immunity doctrine developed, the government is just wrong. It developed on the commercial axis, not instrumentality axis. They have two cases that dealt with instrumentalities, but the axis in the common law is one of commercial. So if the government is right about the restrictive immunity developing along the commercial, that frees them and allows them, and states too, I guess, to prosecute any sovereign itself. The Defense Department, National Park Service, they sell coats and stuff. I mean, our sovereign governments do engage in lots of commercial activities. And next, they say for at least the past 70 years, the federal government has been applying federal criminal jurisdiction often through subpoenas to foreign government-owned corporations. What's your answer to that? So there's been hundreds of thousands, if not a million, of subpoenas, and they came up with five. Five. It's not much. And then they're over, we cite this on page 11 in our reply brief, they go all over the country saying a civil subpoena is not even enforceable against a foreign government because it's offensive to their dignity, it's offensive to international law. And so it seems a little much to be worried about their ability to get criminal subpoenas when they can either call up, we have a treaty, or, you know, I don't know. And I also think there's a huge distinction between a subpoena and actually telling a foreign country, having them convicted by a jury, that they're a criminal. Okay, and you said earlier Congress should have a vote. The way I conceptualize this, Youngstown Category 2, so Congress doesn't authorize, Congress doesn't prohibit it, but Congress does have a vote. But if we rule against you and Congress says, no, we don't agree with the President's national security determinations in this area and we're going to take this option off the table, my reading of the Constitution is Congress could do that. So Congress has a voice even if you lose. Yeah, my reading under this Section 2 is you're going to give them the deference that they are due in foreign policy if Congress hasn't spoken. And again, you've already tied two hands behind my back saying 1331, they've spoken. So yeah, then I'm having trouble in Part 2. But if I think I'm in Part 2 right, Congress has given general jurisdiction for federal courts and could not have possibly contemplated that that meant sovereigns could be convicted and it left it up to the, I don't know who the first Attorney General was, Randolph maybe? I don't know. But whatever that guy's name was, that they left it up to him to prosecute Britain. The Solicitor General, again, representing the administration says, nothing could embarrass the executive branch more than a judge-made principle that would vitiate a federal criminal prosecution. You want to respond to that? Yeah, I mean, I was not impressed by that given how ahistorical that this prosecution is. It is, countries kill people, they engage in extrajudicial killing all the time and the notion and instrumentalities do things like lots of stuff. Well, should it be all or nothing? I mean, that's taking a tool, telling the president that actually if you want to go after this bank, you can't use this tool, you have to use a more extreme tool. The more extreme tool is a massive CFR provision that is for Iran sanction violations. It's like 80 pages that tells you how you go after sanction violations. It has massive penalties, massive. You can, I don't want to say you can shut our bank down, but you can shut banks down for sanction violations. So what are they doing in criminal other than insulting the sovereign? Well, I mean, if you, again, I don't know, but the news reports suggest this was discussed with President Erdogan that Turkey's foreign minister is coming to the United States this week. I mean, I don't, you know, I don't know about all that, but I do know that we don't know about all that. Yeah, but I know that you shouldn't let 12 Manhattan jurors figure this out, which is what you're doing. You're letting them go to a jury and put a foreign sovereign on trial. That's what the indictment says is that the government of Turkey committed a crime and did it through its arm of state. That's just a serious accusation. We think it's false. And I get that the executive always gets to decide what to do for criminal prosecutions. But I really think you have to assume Congress gave the executive that power from day one when it wouldn't even let foreign courts deal with diplomats and it made it a crime to charge their servants. Okay, that's it. Thank you for your time. Sorry to take up so much of it. Justice Barrett? Ms. Platt, I think one of your compelling consequentialist arguments is this argument about the states going wild if the FSIA doesn't apply. But presumably, you know, states have broad grants of criminal jurisdiction in their courts. Is it, you know, have states, I'm just wondering if you know as an empirical matter, have states tried to prosecute commercial entities or instrumentalities? And if so, is it common law immunity that holds it back or is this kind of the finger in the dike? So that, you know, the instrumentalities can say, oh, no, you know, the FSIA deprives you of jurisdiction. Well, if you've just ruled against me that the FSIA doesn't apply, they don't have anything but common law immunity, whether that's a federal common law immunity that applies in state court or what have you. But empirically… Right, I'm just talking about, I'm not talking about going forward. I'm just saying, right now, have states even tried it? No, because there's been no decision that has said that, I mean, you're the Supreme Court, so no. But OPEC fixes prices, so that's an antitrust violation. Sure, but prosecutors are clever, right? And I'm just wondering if the FSIA is the only thing that's holding this back and its provision depriving states of, you know, jurisdiction to adjudicate such claims. Have they tried it and made these arguments? And you're just saying you think not. I don't know if anybody has thought that. I have seen cities, I think, prosecute, I think, Mexico for environmental violations, but it was, like, really random. But I don't, it was really random. Okay, thank you. Justice Jackson? So, if you're right, that there's common law absolute immunity for criminal prosecutions, criminal violations of foreign states, I guess I'm still struggling with how you get that out of 1604. And wouldn't we expect that Congress would have said something about that? We look at 1604 and it's a single sentence, conferring immunity, but conferring immunity except as provided in 1605 and 1607, which suggests to me that whatever Congress was codifying here, it thought there were exceptions to it. So, how do you read this to be referencing the criminal absolute immunity that you say existed at common law? So, if you just put 1605 exceptions to the side, which is, you know, just as Thomas said on that, the first thing, it's just a plain text reading of 1604. It says the jurisdiction. But I can't put it to the side because the plain text of 1604 says you get immunity except as provided in 1605 and 1607. So, that's the structure. Well, in 1330, only grants jurisdiction for civil cases under those exceptions. But again, I mean, you either buy our, you know, these provisions work in tandem or you're looking at the structure of that Congress just left this completely unregulated and left it to the common law. I mean, if you, if this court is, I mean, if the court wants to say there's a muscular absolute immunity for criminal prosecution, that would apply in state court too. I don't know how you enforce this on state court. It'd have to be, I guess, on final review from a state court. That would be okay, but you just have these battles with the executive branch under, you know, Justice Kavanaugh's reasonable view that the executive branch gets to bring whatever prosecutions it wants, but the other side of the V, where there's a due process right, it's just weird to say, but the judiciary can't decide a dispositive question of the law because your adversary decided it for you and said, well, you have no immunity. So, we're up against a case where you say, well, there's immunity, but the executive branch is saying, well, yeah, but I get to decide it because I know what's best. All right. Thank you. Thank you, counsel. Mr. Fagan. Thank you, Mr. Chief Justice, and may it please the court. Petitioners asking for an extraordinary and unprecedented rule under which any foreign government-owned corporation could become a clearinghouse for any federal crime, including interfering in our elections, stealing our nuclear secrets, or something like here, evading our sanctions and funneling billions of dollars to an embargoed nation, using our banks, and lying to our regulators. And that unprecedented rule is based on essentially nothing. Their reply brief drops all their reliance on their secondary sources and anything in customary international law because none of them apply to foreign government-owned corporations, which are separate juridical entities when they are performing non-sovereign functions like the banking function here. And if this is a, I think opposing counsel called it a cataclysm, if this is a cataclysm, I think it's quite telling that only three disinterested countries have joined an amicus brief in this case. We're not hearing the kind of outcry that you would hear if this were unprecedented. What they're trying to do is ask courts, which courts have modestly quite recognized are the least capable branch of doing this, to invent a new immunity rule that overrides the policy judgments of the federal government, which were carefully considered in this case and carefully considered in the very rare cases where we decide it's necessary to take this step because civil sanctions just aren't going to cut it against a repeated violator of sanctions. And there's no license for that. We take these things very seriously. And there is no basis for the common law immunity rule the court would be inventing. And let's be clear, an idea of common law immunity pervades, I think, all three arguments the petitioner is making here because the idea that there is some common law immunity and that there's some implicit assumption in the air about these kinds of cases is exactly what informs their interpretation of 3231, the FSIA, and the backdrop common law immunity. I'm sorry I ran a little over, Mr. Chief Justice. Mr. Fagan, could you have indicted the country of Turkey itself as opposed to the bank? And if you couldn't, then analytically what's the difference? A couple of points on that, Justice Thomas. I'm not going to disavow the idea that in theory the executive could make that judgment. That said, we do acknowledge that there is a strong customary international law principle against prosecuting a state qua state. We would not endeavor to do so. And I think there are a couple of legal distinctions a court could draw. Number one, the court could say that as the basis for such an immunity is very well established, that could be the very rare case where the court does decide not to defer to the executive where it's really just bucking an established trend as opposed to perhaps trying to nudge the law in a particular direction as we might be perceived to be trying to do in this case. The second thing is actually quite historical, Your Honor. One of the points the petitioner makes in their briefs is that the original Crimes Act applied to persons. Now, then as now, persons obviously covers corporations, but then as now it's generally not understood to cover the sovereign. So one might think that contextually that's just not a thing that Congress contemplated in Section 13 of the Judiciary Act, which is the predecessor to today's 3231. On the state prosecution question that came up, my understanding was that if states tried to do a prosecution in something like this, that the federal government could submit a statement of interest and foreign affairs preemption doctrine exists to ensure that that kind of activity doesn't occur. And if it did occur, that this court would be available to review that kind of action by a state. Garamendi, cases like that. That's exactly our point, Your Honor. And a couple of broader points about that are, number one, there's no dispute, and Samantar, I think, makes quite clear that states could prosecute foreign officials, and there are some instances of them having done so in history for crimes like embezzlement or rape. And the second point I would make is that because they wouldn't be able to prosecute foreign government-owned corporations for their sovereign actions, there would be obvious common law immunity in those cases. Counsel, I'm wondering to what extent you've considered the impact, though, of saying that 1604 doesn't provide immunity. In the last discussion with Ms. Black, the point was made that states really haven't tried this, maybe a municipality here or there. But if we hold that 1604 doesn't apply to criminal cases, then states would be free to try to bring lawsuits against Mexico for this or that, or perhaps China because of COVID, or who knows what a creative state prosecutor might come up with. And normally, when a federal official is charged with some crime in state court, you have a right to removal. I think it's 1442, maybe. But there would be no corresponding right to removal by a foreign sovereign. And that's just a bit of an oddity, an incongruity in your argument. And the only place for review of these state court actions would be in this court at the end of the day, perhaps at the end of those state prosecutions or on some emergency interlocutory basis. And I just wonder, have you given careful thought to those consequences? Well, we have thought about the consequences of our position, and we've given it careful thought. But the absence of a removal provision in those circumstances, I think, is actually a very strong point in our favor. Putting aside foreign officials, for which there is no removal provision also, we know that from Samantar, I think if Congress actually had been thinking about this at all, that is, criminal actions, when it enacted the Foreign Sovereign Immunities Act, it would have included criminal actions in the removal provision, because I think in the world the petitioner is envisioning, courts automatically get right whether the Foreign Sovereign Immunities Act even applies in the first place. That would necessitate, on their view, dismissal of the case. And even that can be wrapped up in complicated questions. You see some of them in the Pangong litigation, where we are prosecuting a Chinese government-owned corporation for acts of economic espionage. And they could even have been brought up here. It's not entirely clear, although Second Circuit precedent kind of precluded us from making this argument below, and we're not contesting it for FSIA purposes. It's not entirely clear that the Turkish Wealth Fund is actually itself an instrumentality. Let's put that aside, because you didn't raise that. And just one last point on 1604. I understand the contextual arguments about 1605, and I get that. But just on its plain language, we normally start with the statute itself. And if the statute itself is clear, we stop there. And here the statute's language doesn't parse out criminal versus civil. It says, you know, the court shall have no jurisdiction to entertain, something like that. A pretty broad language that would normally encompass both civil and criminal in a normal case. So why shouldn't we follow our usual practice here? Your Honor, I think this is a case like United Air Regulatory Group or Brown and Williamson, where you have to look at the statute as a whole. And this statute, if you look at it as a whole from start to finish, is concerned with civil actions. If you start with the title, which was created by Congress, and it's in the statutes at large, it refers to immunity from suit. That's a civil term. It was Congress's decision to place this in the title. I understand the contextual arguments. Okay. I do, and I appreciate them, and I don't mean to cut you off. But just looking at 1604 itself, have you got anything to help us on the language there, or are you stuck and have to go to these contextual arguments? Your Honor, I don't think it would be unreasonable in complete isolation to read that provision as potentially applying to criminal cases as well. Mr. Fink. I'm sorry. I'm sorry. I was just going to say I think this is a case where every single other contextual factor, location, title, everything, the operative provisions, which opposing counsel just told, okay, cuts the other way. I am a bit stuck on the drama of this, but the drama of this is also that U.S. Attorney's offices, there's 99 of them in the country? I believe it's 93 or 94. Whatever the number is, it's up there. Do they have to get approval on every case that they bring against any dependent? We do have a process, Your Honor. A process was followed in this case. No, no. Tell me what that process is. Do they need to get approval, and from whom? Your Honor, we do not have a formal written process, but what I can tell you is the following. Some of the aspects... So assume the following. You don't have a formal written process, which in my mind means that some U.S. Attorney's office, and I hope it's not a city. I don't mean to denigrate anybody. Timbuktu. I'm making up a name, okay? In Timbuktu, some U.S. Attorney's office brings such a suit without getting approval. Can DOJ order them under what authority to dismiss the suit? I think we could. First of all, I suppose that could be a rare case in which the government might, if it did so in derogation of what we understand to be common law immunity, that is, it, for example, brought a criminal action against the Kingdom of Sylvania. Whatever. We could file a suggestion of immunity in that case. But otherwise, I think the Attorney General exercises... I'm sorry. No, Your Honor. Your answer is not yes to could the President or the Attorney General order the suit? I believe the Attorney General and the President would be quite well suited to ordering that suit... Sorry to interrupt.  I don't know how I would want to leave to the vagrancies of individual prosecutors, whether it's federal or state, the right to insult another nation by giving them this unbridled power to initiate suits. You're saying it's limited by the common law, but I'm putting aside that I don't know where the dividing line really is on what constitutes commercial and what constitutes sovereign. But that has a danger all its own, doesn't it? Well, Your Honor, just to finish up the point on the U.S. Attorney's offices, I don't think any of the questions here could turn on whether there's a formal written policy, and just because there's not a formal written policy... Now, what do I do with the hearsay news reports that came out that the prior administration was trying to apply pressure to drop this lawsuit on the Southern District of New York? This is a Southern District of New York case. It is, Your Honor. So what do I do with that? Your Honor, I think those are internal government deliberations. Some of them have been brought to light. But I think what they do show is there was a process. The U.S. Attorney did not just go through and indict the case without permission from Maine Justice. But turning to the question of... Why on earth does it go seek permission from the Department of State? Because who's the executive to make this decision? We all agree it's the President. But there is no formula out there to tell us who speaks for the President. You're saying in this lawsuit it's you, and I respect that. But I'm talking about before it gets to the Supreme Court. Who's going to speak so that state courts and U.S. Attorney's offices will listen? Your Honor, the consultation process in this case, I'm given to understand, involved the other affected departments, like the Treasury Department that was lied to and the Department of State. I stand here on behalf of the United States, representing every single one of those agencies. They all stand behind this prosecution. I understood you to be drawing a distinction between this sovereign, quasi-sovereign, and instrumentalities earlier. But what do you do with what Turkaye said in its amicus brief, which is that Hope Bank is an arm of the state indistinguishable from the government itself? Do they get to have a say in that? Or who makes that judgment? This court has definitively held that it is not the domestic state that gets to make this judgment. That's in the first national city bank against Banco Para del Comercio Exterior de Cuba, where this court held it was a matter of federal law or international law, but it's not something the state exclusively gets to designate. The court also said in that case that corporations are presumptively separate juridical entities, and that principle dates back to the founding, in fact, before the founding, where it was obviously possible to sue the East India Company. But what do we do with that? I was just going to say if it's a determination for the tribunal, what do they look at? So I think there, although we don't think it applies on its own, the commercial activity exception that the FSIA has is helpful and informative, but of course the definition of commercial there isn't particularly well fleshed out, and it's just something that courts have had to develop. But here we're talking about just what are sovereign and what are non-sovereign actions, the kinds of things that have been held to be sovereign actions. For example, the one foreign case they have on this, the French Supreme Court case, involved the flagging of ships, the registration of ships, which is exclusively something a sovereign could do, but it's not something that I think even the British common law courts had too much trouble with. If you compare the Nabob, the Carnatic case, and the Munaway case that are cited in our briefs, which I believe both are around the time or predate the founding, they distinguish between, for example, treaty-making authority of the East India Company for which it couldn't be sued and the just normal contracting authority for which it could. What do we do with the fact that the FSIA rejects the distinction between sovereigns and their instrumentalities? I mean that would suggest a kind of pre-existing common law rule that the FSIA was picking up from that there was no sharp line between the two. Well, no, Your Honor, I don't think that's quite right because as we note in our brief, and we have a source that goes into this in more detail, the FSIA definition is broader because there are possible foreign policy implications with a case like this, and we don't deny them, that's why we take them so seriously and bring them so rarely. But under the common law, qua common law, they really haven't identified anything in customary international law. But you're saying that when Congress enacted the FSIA, Congress was changing the common law with respect to instrumentalities of sovereign states in that dramatic a fashion? I don't think it was changing the common law. I think what it was trying to do was recognize that other cases could potentially have these kinds of implications and ensure that it was taking care of those cases, too. In fact, if you look at the principal problem at which the FSIA was directed, it was the need for the executive branch to have to handle all these suggestions of immunity letters in all of these private suits. I think suits against corporations might even be more common than suits against states or suits against agencies of states. And, of course, Congress would not have wanted to leave the executive with that burden in those cases, and admittedly it wasn't handling that burden particularly well or particularly consistently. But it didn't, by doing so, move where the common law was and always has been. And in particular, I think there are four principles that kind of show that these kinds of prosecutions are possible, all of which date back to the founding. One is prosecutions against foreign officials, which date back at least to the 1790s. The second would be the well-recognized difference between a corporation and the state, which likewise dates back prior to the founding. The third would be the well-recognized distinction between sovereign and non-sovereign functions, which goes from the East India cases up to the French Supreme Court case and is, frankly, embodied in the FSIA today. And the fourth would be the long history of deference to the executive. Mr. Fagan, what we don't have in that list, though, is any evidence at the time of the founding that a suit against a sovereign, qua sovereign, would be something that our American courts would have accepted in criminal cases. And we talked about 3231 earlier with Ms. Blatt and the Schooner Exchange case. One could read that as jurisdictional or immunity. But the principle was pretty clear, wasn't it, at the time of the founding, that one state couldn't set up its criminal courts to adjudicate the sovereign actions of another country. What do we do about that? So, Your Honor, we're not contesting that principle. And I think what you do here, and this goes to what I take to be one of Petitioner's main arguments today, what I would say about that are that there is a separateness between corporations and sovereigns. I understand that, but that's contested factually here, and it's also not something the Second Circuit much addressed, as Justice Sotomayor pointed out an hour ago. And does that perhaps stand as an argument for remand for consideration of whether 3231 or general law principles, I don't think of it as common law, I think of it as domestic, but general international law principles preclude the prosecution here? Well, Your Honor, if you wanted to remand on that, there is no background. It's not what we want to do or what we will do or what we have the power to do. It's what we are supposed to do under the law that I'm looking for guidance on. I don't think you need to do that. That's not what I need to do either. It's what we should do, I'm asking for your thoughts on. And if the Second Circuit didn't consider this question, if it was an FSIA analysis, and if you concede that there is some general or international common law immunity for sovereigns that the court didn't consider below, isn't a remand appropriate? Well, I think the FSIA is more restrictive than common law in this respect, because I think there could be non-sovereign functions that don't satisfy, for example, the commercial activity exception. So I think that should really be enough. But on the particular issue of separateness, if you'd let me take a quick stab at telling you why this is crystal clear under this court's precedence. If we go back to the Cuba Bank case, whose name I'm sure I mangled in my exchange with the Chief Justice, it makes clear that corporations are presumptively separate juridical entities. And if you compare the petitioner here, and you look at the actual sources that are cited in Turkiyeh's brief, which are a couple of declarations filed in a civil southern district case, what they make clear is that the control over the bank is exercised through the majority shareholder status and the general assembly of shareholders. They could sell those shares tomorrow. It's publicly traded on the Ankara Stock Exchange. They're subject to private banking and regulatory laws, and they can even be sued, and they'll defend in their own name. I don't think anyone's saying you could attach the sovereigns' own assets. I'm sorry to interrupt, but we do have that before us, and I appreciate that. But I guess my question is a little more fundamental, which is, you seem to agree, and I guess I just want to understand if you agree, that at the founding, the understanding of the predecessor of 3231, in light of this country's history, it really is the underdog, and being more concerned about being sued abroad than hailing others into our courts, and worry deeply about the possibility, if we did, what international repercussions would follow for a relatively weak new nation, that there is some core common law immunity that does apply to states, common law, general law, international law, that some court has to apply and consider at some stage. Your Honor, we do acknowledge that, and we're not contesting that it sprung up at some particular time in history, past the founding, or prior to the founding. It applies to states, qua states, but it does not apply to foreign government-owned corporations. I understand that point. Yeah. Thank you. And isn't the question that follows from that, so who should be deciding, under these circumstances, in this case, whether we have a foreign corporation versus their argument that this really is the state? Shouldn't we send it back to the Second Circuit to really flesh that out? Well, Your Honor, I don't think you need to do that for a couple of reasons. Number one, even the professors on their side agree that there's always been deference to the executive on that kind of point. On the point of who's an instrumentality? Sorry, on the point of whether sovereign or non-sovereign functions are being exercised. I guess on the question of who is an instrumentality, I think there's always been deference on that point, too, I mean, I can't tell this Court that that's not subject to any form of judicial review, but here it's clearly covered by the Cuban bank case, because if you look at that, the bank in that case was created by Cuban law, it was 100% owned by the Cuban government, it was financed by the Cuban government, it sent its profits to the Cuban government, and a Cuban minister was the president of the bank. It's on page 614. You don't even have all of those features here, and this is a corporation, much like the kind of corporation the Court contemplates at page 624 of that case, which is a corporation that's established so the government can do some kind of business. And when it does, when it acts through a corporation in our courts, it is subject to the jurisdiction of the United States. And let me just make a quick point on why this is clearly not a jurisdictional rule. I don't think the Court needs to look any further than pages 758 and 759, I think it is, of Ex parte Peru, in which the Court makes quite clear, and there's another one of these interim ship cases, that the Court has jurisdiction, it's just a question of whether it declines or doesn't decline to exercise it. That's perfectly consistent with Schooner Exchange, which talks about waiving jurisdiction, although it spells it without an I. And it also refers to actions that are taken by the sovereign that are clearly actions the executive would take, like barring foreign warships from U.S. ports, which would be something you'd expect the president to do, but not something that you'd expect any other branch of government to do. Can I take you back to the question of what would happen if, let's say, an elected district attorney brings a criminal case against a foreign state or against a component of a foreign state or against a corporation that is set up and owned and controlled by the foreign state? What would happen then? Okay, Your Honor. I mean, putting aside that that could happen with foreign officials already under this Court's law, and we would be in the exact same spot. All right, let's say it's against a foreign state. So say they were against whatever. Again, Your Honor, if they brought a criminal action that said, like, I think there we might well file a suggestion of common law immunity. All right, and so the Court receives that, and the Court says, well, fine, that's your opinion, but we don't agree. Then what? Well, Your Honor, that's subject to review in this Court just the same way. After there's been a trial and an appeal through the state courts until there's a final decision from the Supreme Court of the state, then it could come here? Well, Your Honor, presumably there are some emergency procedures there. Again, you're presupposing that if the FSIA or something like that did apply, that they'd be in safer circumstances. There might be circumstances, I was suggesting earlier, where there is some dispute as to whether, I mean, as apparently there is here, although I don't think there should be, as to whether something actually is an instrumentality of a foreign state or equivalent to the state. The state trial court could refuse to recognize that separateness and just say, you know, batten down the hatches, we're going to trial, and whatever emergency relief would be available ultimately culminating in this Court, that would be available there, would be perfectly available in these circumstances, and this Court usually trusts state courts to get these things right. Right. Under what theory would this state prosecution be preempted by federal law? The supremacy clause applies to the Constitution and the laws of the United States. So what is the law of the United States that would block the state prosecution? Well, Your Honor, I think we'd have a number of options. I mean, if the Court were unprepared to accept some kind of letter from the executive stating that this is contrary to President's foreign affairs determination. We had that. I'm blanking on the name of the case, but we had exactly that. President Bush sent a letter and said, quit, and Texas said, well, thanks for your opinion, but we're going ahead. I don't want to argue against myself. I think you're thinking of Medellin, Your Honor. Yeah, Medellin, right. But even if that were not enough, there are a number of other actions the federal government could take, up to and including, for example, entering into an executive agreement of the sort in Garamendi that would contemplate dismissal of the prosecution and clearly be preempted. I'll come back to this when I have my... Okay. This has happened. There you go. All right, so... Welcome back. Thank you. This does seem to me to get into a very interesting question that has ramifications beyond this case. Would you say that it is a principle of customary international law that would bind the states under a supremacy clause? Well, Your Honor, first of all, let me just reiterate what you just said, which is this is well beyond this case. The court doesn't need to decide it. There are no historical precedents for this. Therefore, under Samatar, it was not a problem Congress was particularly concerned with, and we can worry about it when and if it comes up. If it were to come up, I think we would say that the supremacy clause and just the structure of the Constitution overall, as this court has repeatedly recognized, vests the federal government with exclusive foreign affairs powers. The foreign affairs powers are principally exercised through the executive branch, and the executive branch has a number of tools for ensuring that the states don't start making side treaties or do things that the federal government does not approve of, and I think there would be a number of tools that could be used here. I've suggested a couple of them. Another one of them... I just want to know the status of this rule that's being imposed on the state. So it's an inference from the Constitution. I can understand that. That's what you want us to say. It is an inference from the Constitution that the president can direct that foreign states be sued, but a state can't do that. I understand that. But when you talk about common law, then I'm more confused. Well, I'm not confused. I'm worried, because isn't it a very important question whether customary international law is binding on the states under the Supremacy Clause? I think the court suggested in Samantar that courts should give weight to suggest... I suppose those were federal courts under the FSIA, but the court suggested that for foreign officials, courts ought to give some respect, potentially conclusive respect, to the views of the executive branch, and to the extent that those reflect customary international law, I think that might well be binding on the states, particularly because the states don't have any authority to legislate or take action that would be contrary to customary international law. I mean, I think Medellin might be somewhat instructive here, but I think it's just a more general principle that states should not be taking actions that get the U.S. into foreign hot policy water, and I think if that ever were to happen, and for some reason it did not, in no sense prevailed in the state courts, this court would be able to resolve that problem. But it has never happened, which again, under Samantar, is something that suggests that it was not something Congress was concerned with in the FSIA. It clearly doesn't bear on the threshold 3231 question, and it doesn't have any purchase here where it's the federal... But nothing like this has happened, even. Your Honor, that's not true. We've been doing this for decades. Admittedly, it's since the 80s. I'm not going to claim that we've been doing this for 7,000 years or claim that we've been doing this since the founding because we haven't, but that's because of a rise of government-owned corporations concealing some very serious crimes. If you look at a couple of our recent prosecutions, the Pangong, one I referred to earlier, is a Chinese-owned corporation that is engaging in economic espionage. We have another one against a Chinese-owned corporation that involves nuclear information. And it's the considered judgment of the executive that in rare cases, it is appropriate to bring criminal actions. Justice Sotomayor? Justice Gorsuch? In the absence of state court actions in the past could lead to a couple of different inferences. One might be it isn't a problem, so Congress couldn't have thought about it in the FSIA, and we have tools to deal with it. But it seems to me in equally plausible inferences, state courts haven't done this historically because no one's ever thought any court could engage in criminal prosecutions of state entities. Well, Your Honor, does that argument cut? Well, I think both directions could potentially cut in our favor. If it was unimaginable that a state court in particular could ever prosecute a state, that would suggest that any suggestion of immunity or preemption would be quite well taken. If the assumption instead centered on the FSIA and what sort of procedures it should include, I think the absence of a removal provision is a blinking light here because if Congress were really concerned that this could ever be a problem, it would have given everyone an easy way to deal with it. It's a blinking light both ways, though, it seems to me. The absence of a removal provision might be suggestive that 1604 means what it says, and it just bars these kinds of actions, period. And I know you don't think it's a serious problem, but I guess I'm not totally relieved by your assurances that states won't take a holding that 1604 doesn't bar criminal actions if we were to go down that road. I guess I'm less sanguine about the prospects of state courts not bringing these kinds of prosecutions, and I'm still not sure I understand your answers to Justice Alito about what tools this court would have to discipline that under the Federal Constitution and the Supremacy Clause. Well, again, Your Honor, I think it's quite clear under, for example, Garamendi, that if there were ñ But what provision of the Constitution? I understand your cases. You've said them. I don't want to repeat that. But what provision of the Constitution would you point to that would allow this court, through the Supremacy Clause, which, again, as Justice Alito talked about, is, well, we certainly have the right to tell state courts that they are violating the constitutional or federal laws. But on what authority could we tell them that they're violating customary international law? Well, Your Honor, I think very clearly this would extend to, for example, executive agreements. And if this were rising to the level of really becoming a problem, even though it has literally never happened, I understand. And it is, therefore, under Samantar, not something that Congress was going to be concerned with here. I got that. We could make an executive agreement with the other country that would clearly, under Garamendi, preempt the state prosecution. Just a couple follow-ups. You said earlier you were representing all the executive departments and agencies. You're representing the President, too, correct? That's correct, Your Honor. President Biden? Yes, Your Honor. And this action was actually brought by the previous administration. Right. Okay. Justice Sotomayor was asking you about the process. And I don't think you described it in full, the process, not written, but the process that occurs in a situation like this, which I assume, in all indications, would involve the Attorney General and the Secretary of State and the National Security Advisor and the White House Counsel and probably the President, too. But is that the normal process for something like this, or do you not want to talk about that? Your Honor, I'd prefer not to discuss the details of internal processes. What were you going to say about the process, because you were going to say something. I think I said all I was planning to say, Your Honor. I didn't mean to leave the impression that I left something in the box. But, I mean, just to reiterate, I think it is well, perhaps what I was not able to say, I think it is well understood in the U.S. Attorney's Office that they would need to run this kind of thing up the chain. And when it's run up the chain, the chain will, if you'll forgive the mixing of metaphors, grow some spokes and will consult with the other portions of the federal government that might have concern with a case like this. We don't have examples of cases, and this certainly isn't one of them, in which something is just a frolic and detour by some individual Special Assistant U.S. Attorney in some satellite office that only contains that Special Assistant U.S. Attorney. Okay, last question. This is going to take the opposite perspective of the questions I was asking Ms. Blatt and picks up on Justice Gorsuch's question. So another way to look at this under the Youngstown framework is to think, well, we should, to avoid all these questions that have been coming up that are difficult, we should try to fit this case within the statutory scheme that exists, and that Congress, in essence, has authorized prosecutions, or at least said no immunity necessarily when it's commercial activity, has suggested immunity otherwise, and that if the executive branch wants more authority than what they could get out of the FSIA, there's indications that they can go back to Congress. Now, maybe that's the entirely wrong way to look at it, but that's what I was thinking on the other side of how to think about this case. In other words, some limits on the executive, and if you want more power, go to Congress. So if Your Honor is supposing that the 3231 question is decided in our favor and has decided that the FSIA does apply, but the commercial activity exception likewise applies, I think 1330 can't just be... Why is that not a bad resolution just thinking about this at a bigger picture level? The Second Circuit's approach there was, you know, kind of no harm. Well, Your Honor, I don't know that as a practical matter we'd have a problem with that. For the reasons I've said, I don't think that's the correct solution. But if the court were to do that, I think that would simply affirm the decision below, in which both courts found the commercial activity exception applies, I think we'd be fine with that. No systemic problems from that. Well, as I've said, Your Honor, we don't take these things lightly. Okay. That answers the question. Thank you. Justice Barrett? Justice Kavanaugh pointed out in his colloquy with Ms. Blatt that these kinds of suits might be an important tool in the executive's toolkit. Could you explain why? I mean, given that the government has the authority to prosecute the individual, like, you know, the executives at the bank, you know, given that the executive is not going to prosecute the country itself, you say. So what if... I just want to understand the backdrop. What does the government get out of going after the bank as opposed to all the individuals who work in the bank? Sure, Your Honor. A few things. First of all, the individuals, as a couple of the individuals are in this case, may be beyond our reach or missing. You could imagine a hostile foreign government acting through one of its corporations that just rotates people in and out and withdraws them and won't extradite them for us. More generally, what this does is force a change in the corporation as a whole or potentially disable it. The kinds of penalties we can seek under the criminal provisions would allow a penalty of up to two times the amount involved in the money laundering. But if it's a hostile government, why are they going to cooperate with any of that and why can't you just impose sanctions or use other tools? Well, Your Honor, a couple of points. First of all, the other criminal remedy I was going to mention is potential forfeiture of all the assets involved in the offense. And if that were imposed potentially as a condition of probation or something to that effect, then that would enable the United States to essentially disable the petitioner bank from doing various things within the United States. As for other potential remedies, under the civil remedies, which I believe are 50 U.S.C. 1703, in order to impose fines for that or civil sanctions for that, we'd have to trace each transaction, which is going to be incredibly difficult in the context of a money laundering scheme where the specific purpose is to hide it. We'd have to go through transaction by transaction. And the other problem is some of these remedies are sledgehammers. Some of the remedies they propose, up to and including going to war with Turkey, are not things that would have very destabilizing consequences. And what we want to do is to deter other government-owned corporations from these kinds of actions, deter, frankly, other governments from trying to use corporations to do these kinds of things. I'm not saying that that's what happened here, but just hypothetically. And also just to disable this particular bank from doing the kinds of commercial activities, potentially, that it was engaging in that led to this prosecution. What about the retaliatory consequences that Ms. Blatt points out could result in the other ways? The United States is not concerned about those, about foreign countries initiating criminal actions against U.S.-owned corporations? A couple of points on that, Your Honor. It's not like we undertook this lightly, as I've said numerous times. We have considered that possibility. Well, I understand that, but I think part of the questions that you've been getting about states is that, however carefully the United States might consider it before initiating such a prosecution, it may or may not be possible to control what states and municipalities do. And that leads to exactly the second point I was going to make, Your Honor, which is we never controlled what they were going to do. Now, if they decide, I don't know, this will enable them, to the extent that we have government-owned corporations that look like Petitioner here, they will be able to point to this and other cases that we've already brought, and some of which have been resolved, like the recent Petrobras case in Brazil, as precedent for whatever proceeding they wish to undertake. But even before that, they weren't necessarily beholden to our view of the law in the first place. But we acknowledge that what's good for the goose is good for the gander. We've considered that, and we're prepared to deal with it. Many of the instrumentalities that might be at issue in those cases, or actually they wouldn't really be instrumentalities, they'd be corporations, don't do a great deal of operation outside the United States. You know, for example, if the government bailed out GM by buying 75% of its stock, we wouldn't be asserting that GM couldn't be sued in another country. We wouldn't view that as a suit against the United States. Thank you. I'm sorry. I said suit. What I meant even was prosecuted, and we wouldn't view that as a criminal prosecution against the United States. Justice Jackson? Yes. Can I just go back quickly to Justice Kavanaugh's point about the FSIA? I guess I'm trying to understand whether if we agreed that the commercial activity exception applied in this circumstance such that there is no immunity under that statute, would that be the end of it, or would we still go on or have to contend with the issue of common law immunity in the criminal realm? I think the FSIA, where it applies, displaces common law immunity. So we'd have to have the sort of predicate determination that the FSIA is applying in the criminal realm? Yes, Your Honor. I think that would be incorrect to hold. I think in order to completely avoid looking, I don't know the court can avoid looking at the common law itself, because, again, as I suggested when I started my presentation here, that pervades all of their arguments. Right. So I guess I'm just trying to understand your answer to Justice Kavanaugh and the suggestion that we could just look at the FSIA and not address the common law. Wouldn't you have to at some level? I was taking as a given what I understood to be Justice Kavanaugh's premise that the court had already decided, contrary to our view, and I think, frankly, incorrectly, that the FSIA does apply to criminal matters. If it does, then it would displace the common law, and it would be fine just to look at the commercial activity exception. I think there are maybe some differences between the commercial activity exception and the common law, and, again, we don't think the FSIA does apply and the common law might give us slightly broader reign over non-sovereign actions. We may not need to locate the acts in the precise same way the acts comprising the government of the offense. Okay. Can I just ask you one last question, mindful of the time? So what is your position as to how much weight courts have to give to an executive non-immunity determination? Is it dispositive in your view? And if so, why isn't that in tension with this notion of there being some absolute immunity in the criminal law realm? Well, Your Honor, a couple of points on that. I think Republic of Mexico against Hoffman suggests that it would essentially be dispositive. I think it would particularly be dispositive in action such as a criminal prosecution brought by the sovereign itself. But even aside from that, the court wanted to draw a distinction, as I think I suggested earlier today. There might be cases where it is so clear that what the executive is asking for deference for is completely contrary to customary international law, that the kind of role that the executive is playing in this case in developing international law, which the court recognizes perfectly legitimate in Sabatino, for instance, wouldn't really pertain. And you would really have a situation in which a court might independently decide that deference is not warranted. But we're nowhere near that here, because as I suggested, as I began and may end, there really isn't anything here. There's no there there. There's nothing about government-owned corporations that are exercising non-sovereign functions, which are separate juridical entities, and their actions aren't presumptively attributed to the government. That's why the FSIA itself, in section 1606, allows punitive damages against government-owned corporations, but not against the sovereign itself, because the actions of the corporations can be wrongful, even if we don't think the actions of the sovereign qua sovereign can. When you were answering Justice Barrett's questions just now, were you talking about foreign states or U.S. states, or both? I was understanding her questions to be about foreign states. Okay. Got it. Thank you. Thank you, counsel. Thank you. Ms. Blatt? I'm just going to take one more stab at 3231. I really thought it should have gone without saying that Congress has not authorized federal courts to convict Israel, Saudi Arabia, or the Vatican City. I mean, nothing has changed in the wording of the statute since the founding, and all the government has is to return us to pre, I guess, before 1976, that the executive will sort of make this up as it goes, and courts will have to figure this out on their own, even though Congress expressly granted jurisdiction over foreign sovereigns in 1332 and 1875. So there's always been express congressional authority to deal with sovereigns. And on this bit about sort of let's just do it all under the common law, the government waived any argument that Halk Bank is not an arm of the state of Turkey. It went whole hog. It said, we can indict sovereigns qua sovereigns, and we can waive immunity at will. It never made any argument in district court that we weren't a sovereign arm. And no matter what he set up here, his indictment indicts the government of Turkey acting through its bank, although only the bank is named in the indictment. The other thing he mentions on this wealth fund, on page five of our brief and the Turkey brief, it makes clear, it cites a declaration, and that declaration says the wealth fund is not a juridical entity. It is like the general fund, the Social Security fund, the judgment fund. It's an actual fund of the Treasury Department. So it actually just has no legal entity. So I don't see how the wealth fund is at issue. On this bit about wealth, I think he said we'll protect sovereigns qua sovereigns and we'll protect instrumentalities acting with sovereign actions. And I think that gets into the waiver point. The indictment itself alleges that this was carried out on behalf of Turkey to inflate their exports. And, again, on the international about common law, if you're going to develop a common law that's never existed, because this will be the first criminal trial of any sovereign instrumentality over its objection or sovereign, you're going to make it up. And you would normally look at history, practice, international law, reciprocity, and the distinction under all laws in any context between sovereigns, their entities, and their instrumentalities. You're giving courts no guidance except for, I guess, go back to the British India something or other. That wasn't even a foreign corporation. And always through the law in the U.S. also. One other thing I will say about this Cuba case, no one disputes that a juridical entity, Amtrak, is juridically separate from the United States. And that case, the Cuba case, says Amtrak can't be liable for the United States' debts, although the court went on and said we're going to make Cuba liable for the bank's debts. But the Postal Service, last time I checked, was a separate juridical entity. Last time I checked, it mails things abroad. In most states, the Postal Service is a commercial activity. And so there are lots of entities that actually do things abroad. And so for the government to come up here and say, well, I don't know who's going to determine it's a sovereign act. I guess it will be Venezuela courts or Russian courts or someone like that. But they're not going to be bound by the government's argument here. Thank you. Thank you, counsel. The case is submitted.